**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

NORTH BREVARD HOSPITAL DISTRICT d/b/a PARRISH MEDICAL CENTER,

    Plaintiff,

v.   Case No: 6:16-cv-637-Orl-40DCI

MCKESSON TECHNOLOGIES, INC.,

    Defendant.

## ORDER

This cause comes before the Court on Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint or, in the Alternative, for a More Definite Statement and Memorandum of Law (Doc. 51), filed December 14, 2016. On December 22, 2016, Plaintiff responded in opposition. (Doc. 52). Upon consideration, Defendant's motion to dismiss and alternative motion for a more definite statement will be granted in part and denied in part.

**I.   BACKGROUND**

    **A.   Facts[1]**

The parties' dispute in this case arises against the backdrop of the Patient Protection and Affordable Care Act ("ACA"). Pertinent to this lawsuit, ACA and other related laws offer certain financial incentives to healthcare providers and hospitals which

---

[1] This account of the facts is taken from Plaintiff's Second Amended Complaint (Doc. 47), the factual allegations of which the Court accepts as true when considering Defendant's motion to dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).

1

adopt, implement, upgrade, or demonstrate "meaningful use" of approved electronic health records technologies.  ACA's purpose in rewarding healthcare providers and hospitals in this manner is to improve the transmission of patient healthcare information so that healthcare professionals can make quicker, better, and more-informed clinical decisions for patients.

To that end, Plaintiff, North Brevard Hospital District d/b/a Parrish Medical Center ("PMC"), is a public non-profit hospital located in Titusville, Florida, and Defendant, McKesson Technologies, Inc. ("McKesson"), is a Delaware corporation which offers healthcare, financial, and operational information technology ("IT") products and services to healthcare providers and hospitals like PMC.  In 2009, PMC issued a request for proposal seeking bids on a project to replace PMC's aging electronic medical records system. (Doc. 47, ¶ 5). Through this project, it was PMC's goal to achieve full interoperability[2] and meaningful use throughout its IT systems by ACA's July 2013 deadline and to, therefore, benefit from ACA's incentive program.  (*Id.*).

McKesson responded to PMC's request for proposal with a product line called Horizon.  According to PMC, McKesson billed Horizon as "a comprehensive suite of integrated clinical, financial, and resource planning IT solutions to meet PMC's current and future IT requirements."  (*Id.* ¶ 5).  McKesson's proposal attributed a number of benefits to Horizon, including that Horizon was easy to use, supported a paperless environment, ensured seamless interoperability among PMC's different IT systems, enhanced communication and coordination among physicians and staff, met all regulatory

---

[2]   PMC explains that "interoperability" refers to the capacity of different IT systems to communicate, exchange data, and to use the information that has been exchanged. (Doc. 47, ¶ 5 n.1).

2

and certification requirements, and positioned PMC to realize the maximum benefits under ACA's meaningful use incentive framework. (*Id.* ¶ 6). The proposal also touted several advantages to choosing McKesson over other healthcare IT providers, including that McKesson was committed to helping PMC meet ACA's July 2013 deadline, offered superior healthcare IT solutions, had more knowledge and experience in healthcare IT than any of its competitors, and would provide PMC with attractive financing and payment terms. (*Id.* ¶ 7). As a result of these representations, PMC decided to choose McKesson as its healthcare IT provider and to implement McKesson's Horizon product line. (*Id.* ¶ 9).

In December 2010, PMC entered into an agreement with McKesson and began the process of purchasing and obtaining the licenses to McKesson's Horizon products and services, committing a total of $25 million to the project. (*Id.* ¶ 9). However, one year later in December 2011, McKesson informed PMC that it would no longer support the Horizon product line, but would instead shift over to its new Paragon line. (*Id.* ¶¶ 14–15). At this point, McKesson had not yet fully installed and implemented Horizon at PMC and, consequently, PMC had not yet achieved meaningful use so as to benefit from ACA's incentive program. (*Id.* ¶ 14). PMC therefore faced a choice: either keep the partially-installed Horizon system which McKesson would no longer support, transition to the new Paragon system with McKesson, or find a new healthcare IT provider entirely notwithstanding the millions of dollars PMC already spent with McKesson. (*Id.* ¶ 19). To assuage PMC's concerns, McKesson again promised that PMC would achieve meaningful use by ACA's July 2013 deadline if it chose to transition to Paragon. (*Id.* ¶¶ 28–29). As a result, PMC executed a new contract with McKesson on March 29, 2012, and agreed to transition from Horizon to Paragon. (*Id.* ¶ 21).

3

PMC's experience during the Paragon transition, however, was less than ideal. While McKesson officially introduced Paragon at PMC on May 8, 2012, McKesson did nothing to implement the system until mid-August 2012, resulting in an estimated completion date of April 15, 2013. (*Id.*). Given this tight timeline, PMC and its consultants worried that meaningful use would not be achieved by ACA's July 2013 deadline. (*Id.* ¶ 23). Further, PMC quickly found that the Paragon product line did not function as McKesson promised and would not result in full interoperability among PMC's IT systems, a key reason PMC had chosen McKesson and Horizon in the first place. (*Id.* ¶¶ 22, 26). Finally, on December 3, 2012, McKesson presented PMC with a scope of work which proposed meeting the July 2013 deadline only if PMC paid McKesson an additional $4 million. (*Id.* ¶ 24). It was at this point PMC realized that McKesson "had misrepresented its Paragon IT product line and its ability to meet PMC's requirements as promised." (*Id.*).

Due to McKesson's shortcomings, PMC ultimately terminated Paragon's implementation and retained another healthcare IT provider at a cost of $8 million. (*Id.* ¶¶ 25, 39). Through this other provider, PMC quickly achieved meaningful use by the July 2013 deadline and qualified for ACA's incentives. (*Id.* ¶ 39).

### B.     Procedural History

On March 24, 2016, PMC initiated this lawsuit in state court, after which McKesson removed. On November 11, 2016, PMC filed the Second Amended Complaint, which remains PMC's operative pleading. In its Second Amended Complaint, PMC asserts eleven counts in total, including claims that McKesson breached various warranties and contractual provisions relating to the Horizon and Paragon contracts, committed fraud,

breached its fiduciary duty with PMC, violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and engaged in false advertising.  In short, PMC accuses McKesson of pulling a high-level bait-and-switch, whereby McKesson sold PMC on the Horizon product line despite knowing that it would no longer support Horizon, and then convinced PMC to transition to the more expensive, lesser quality Paragon product line as PMC faced ACA's looming meaningful use deadline.  McKesson now moves to dismiss PMC's Second Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.     STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's complaint.  In order to survive the motion, the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face when the plaintiff alleges enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The mere recitation of the elements of a claim is not enough, and the district court need not give any credence to legal conclusions that are not supported by sufficient factual material. *Id.*  District courts must accept all well-pleaded allegations within the complaint and any documents attached thereto as true and must read the complaint in the light most favorable to the plaintiff. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam).

## III.    DISCUSSION

McKesson moves to dismiss the Second Amended Complaint for several reasons, which the Court discuss in the most logical order.

### A. PMC's Second Amended Complaint is Not a "Shotgun" Pleading

First, McKesson contends that the Second Amended Complaint should be dismissed as an impermissible "shotgun" pleading or, alternatively, that PMC should be required to issue a more definite statement.  The Eleventh Circuit has recently described four types of "shotgun" complaints which require dismissal:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint.  The next most common type . . . is a complaint . . . replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.  The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief.  Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (footnotes omitted).  All four categories of "shotgun" complaints are deficient because "they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Id.* at 1323 (footnote omitted); *see also Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).

The Court has reviewed PMC's Second Amended Complaint and finds that it does not suffer from any of the "sins" identified by the Eleventh Circuit in *Weiland*.  PMC's complaint satisfies Rule 8's and Rule 10's pleading requirements and otherwise fully informs McKesson of PMC's claims and the grounds supporting each claim.  The Court will neither dismiss the Second Amended Complaint as a "shotgun" pleading nor require PMC to issue a more definite statement.

> **B. The Court Will Not Dismiss Claims Purportedly Released by the Paragon Contract**

McKesson moves to dismiss ten of PMC's eleven claims on the ground that PMC released these claims when it executed the Paragon contract. To that end, McKesson asks the Court to look to the Paragon contract which contains the release, and find that PMC cannot state a claim for any count which has been released.

When considering a Rule 12(b)(6) motion to dismiss, a court ordinarily must "not consider anything beyond the face of the complaint and documents attached thereto." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (per curiam). However, an exception to this rule lies where (1) the defendant attaches a document to its motion to dismiss, (2) the plaintiff incorporates or refers to the document in its complaint, (3) the document is central to the plaintiff's claims, and (4) the plaintiff does not challenge the authenticity of the document. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). When all four of these conditions are met, the court may, in its discretion, consider the extrinsic document when ruling on the defendant's motion to dismiss, and may do so without first converting the motion into one for summary judgment. *See id.*

As a preliminary matter, McKesson has not attached the Paragon contract to its motion to dismiss. Instead, in a footnote, McKesson refers the Court to a previous, now moot motion to dismiss it filed against PMC's First Amended Complaint, which motion did attach the contract. Since the Eleventh Circuit's rule for considering extrinsic material on a Rule 12(b)(6) motion to dismiss requires the defendant to attach the material to its motion, McKesson's failure to attach the Paragon contract to its motion to dismiss is reason enough not to consider it.

Notwithstanding, another reason counsels against considering the Paragon contract as well.  In its Second Amended Complaint, PMC describes a complex contractual relationship with McKesson involving the execution of over 130 contracts, contract amendments, and contract cancellations relating to PMC's purchase and use of Horizon and Paragon. (Doc. 47, ¶ 37(D)).  Indeed, the Paragon contract which McKesson asks the Court to examine identifies four other contracts which it purports to cancel and release.  (Doc. 30, Ex. C, p. 1).  At this stage of the proceedings, and without the benefit of a fully-developed evidentiary record, the Court cannot say with any degree of confidence that any release contained within this singular contract governs the causes of action PMC raises in this case.  The Court will therefore decline to consider the extrinsic Paragon contract at this time.

### C.     PMC Fails to State a Claim for False Advertising

In Count XI, PMC alleges that McKesson violated section 817.41, Florida Statutes, by engaging in false advertising.  McKesson moves to dismiss this claim on the ground that PMC fails to allege facts demonstrating that McKesson made any statement to the public which would constitute false advertising.

Section 817.41 makes it unlawful to "make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement." Fla. Stat. § 817.41(a). A necessary element for stating a false advertising claim under § 817.41 is that the plaintiff must establish that the defendant made or disseminated a misleading advertisement to the general public or to a portion of the general public, as opposed to targeting a sales pitch to a specific buyer.  *See S.H. Inv. & Dev. Corp. v. Kincaid*, 495 So. 2d 768, 770–71 (Fla. Dist. Ct. App. 1986) (holding that a

8

§ 817.41 false advertising claim will not lie where the complaint merely alleges that the defendant made a misleading sales pitch to the plaintiff).

Here, PMC fails to demonstrate that McKesson made or disseminated a misleading advertisement to the general public or to a portion thereof. All PMC alleges is that it solicited proposals from several healthcare IT providers and that McKesson responded with a sales pitch targeted to PMC's solicitation. (Doc. 47, ¶ 5). PMC consequently fails to state a claim for false advertising under § 817.41 and Count XI will be dismissed.

### D. PMC's Fraud-Based Claims are Not Barred by the Statute of Limitations

McKesson next moves to dismiss PMC's FDUTPA claim (Count I), fraud claims (Counts VII, VIII, and IX), and negligent misrepresentation claim (Count X). McKesson argues that these fraud-based claims are barred by the statute of limitations.

In Florida, causes of action based on fraud are subject to a four-year statute of limitations. Fla. Stat. § 95.11(3)(j). The limitations period begins to run from the time the facts giving rise to the fraud "were discovered or should have been discovered with the exercise of due diligence." *Id.* § 95.031(2)(a). In the Second Amended Complaint, PMC alleges that it was not until December 3, 2012—when McKesson sought an additional $4 million to complete the Paragon installation on time—that PMC "determined that McKesson had misrepresented its Paragon IT product line and its ability to meet PMC's requirements as promised." (Doc. 47, ¶ 24). Further, the Court is unable to conclude from the facts stated in the Second Amended Complaint that PMC should have discovered the alleged fraud at any earlier time. Since PMC initiated this lawsuit in state

court on March 24, 2016, PMC brought its fraud claims well within Florida's four-year limitations period.

### E. PMC's Fraud-Based Claims are Pled with Sufficient Particularity

McKesson also moves to dismiss PMC's fraud-based claims for failing to satisfy Rule 9(b)'s heightened pleading requirements. In federal court, all claims sounding in fraud—including claims for negligent misrepresentation, and violations of FDUTPA— "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Particularity means that a plaintiff must plead facts as to time, place and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)) (internal quotation marks omitted). In other words, the plaintiff must identify: (1) the allegedly fraudulent statement, document, misrepresentation, or omission made; (2) the time, place, and person responsible for the statement, misrepresentation, or omission; (3) the manner in which the statement, misrepresentation, or omission misled the plaintiff; and (4) what the defendant gained from the alleged fraud. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

PMC provides detailed information in its Second Amended Complaint about the circumstances constituting the alleged fraud. PMC identifies at least twenty-five specific representations and promises that McKesson allegedly made regarding its Horizon product line and the McKesson company when it responded to PMC's 2009 request for proposal. (Doc. 47, ¶¶ 6–7). PMC emphasizes that, despite these representations and

promises, McKesson omitted that it intended to abandon Horizon and would no longer service the product. (*Id.* ¶ 8). PMC reveals that McKesson made similar representations and promises regarding Paragon as McKesson attempted to convince PMC to transition—most notably, that Paragon would be installed and fully implemented by ACA's July 2013 deadline. (*Id.* ¶¶ 21, 29). PMC also identifies representations made in November 2012 by McKesson's CEO, John H. Hammergren, echoing the promise that Paragon would be fully operational by ACA's deadline. (*Id.* ¶¶ 23, 31). PMC quotes particular provisions of the Paragon contract warranting that Paragon would be fully interoperable throughout PMC's IT systems. (*Id.* ¶ 22). And PMC provides a laundry list of specific ways in which Paragon was insufficient to meet McKesson's promises. (*Id.* ¶ 37(G)).

PMC asserts that it relied on McKesson's numerous representations and promises—and believed that McKesson had no plan to abandon Horizon—when it first chose McKesson as its healthcare IT provider. (*Id.* ¶¶ 27, 121). PMC also says that it relied on McKesson's continuing representations and promises regarding Paragon, and that these promises caused PMC to stick with McKesson through the transition to Paragon. (*Id.* ¶¶ 28, 31, 121). Despite all the promises, McKesson never delivered, and PMC was forced to retain a new healthcare IT provider at significant expense. (*Id.* ¶¶ 12, 25, 39). PMC alleges that McKesson has wrongly kept several million dollars which are due to be refunded as a result of McKesson's broken promises and deficient products. (*Id.* ¶ 43).

In sum, PMC sufficiently describes the circumstances surrounding McKesson's alleged fraud, including the particular representations made, who made these

representations and when, how the representations misled PMC, what PMC lost, and what McKesson gained as a result. PMC's fraud claims therefore satisfy Rule 9(b)'s requirements.

### F. PMC Fails to State a Claim for Breach of Fiduciary Duty

Next, McKesson moves to dismiss Count VI, which alleges a claim for breach of fiduciary duty. McKesson argues that its business relationship with PMC is not enough to amount to the fiduciary relationship necessary to state a claim.

As part of stating a claim for breach of fiduciary duty, the plaintiff must establish the existence of a fiduciary relationship with the defendant. *Crusselle v. Mong*, 59 So. 3d 1178, 1181 (Fla. Dist. Ct. App. 2011). "Fiduciary relationships can be created expressly or impliedly under Florida law." *Arbitrajes Financieros, S.A. v. Bank of Am., N.A.*, 605 F. App'x 820, 823 (11th Cir. 2015) (per curiam). An implied fiduciary relationship results when the particular circumstances of the parties' relationship create "a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party." *Masztal v. City of Miami*, 971 So. 2d 803, 809 (Fla. Dist. Ct. App. 2007).

While there is no bright line delineating which types of relationships are enough to create an implied fiduciary duty, Florida's courts and federal courts applying Florida law largely hold that parties to an arms-length business transaction do not enjoy a fiduciary relationship. *See, e.g.*, *BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 664–65 (11th Cir. 2016) (per curiam) (finding no implied fiduciary relationship between investors and an investment manager due to arms-length business deal); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1179–80 (M.D. Fla. 2005) (finding

no implied fiduciary relationship between two companies which entered into business agreement); *Mac-Gray Servs., Inc. v. DeGeorge*, 913 So. 2d 630, 633 (Fla. Dist. Ct. App. 2005) (finding no implied fiduciary relationship between buyer and seller of laundromat equipment). This is because "there is no duty imposed on either party [to a business relationship] to protect or benefit the other." *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. Dist. Ct. App. 2003) (per curiam).

Here, the facts alleged in the Second Amended Complaint describe nothing more than an arms-length business relationship between PMC and McKesson. Both PMC and McKesson are sophisticated parties well-versed in the healthcare industry. (*See* Doc. 47, ¶¶ 2–3). PMC solicited proposals from several healthcare IT providers to replace its aging electronic medical records system, to which McKesson responded. (*Id.* ¶ 5). The parties then engaged in months of negotiations which culminated in a contractual agreement. (*Id.* ¶¶ 8–9). The parties continued their relationship for approximately two more years, during which PMC and McKesson again negotiated various aspects of their business, including the transition from Horizon to Paragon and the issuance of refunds and credits for work unsatisfactorily performed. (*Id.* ¶¶ 21, 23–24, 28). While PMC accuses McKesson of deception as to its products and services, there are no facts from which the Court can reasonably infer that McKesson undertook to protect or act for the benefit of PMC. Accordingly, PMC's breach of fiduciary duty claim will be dismissed.

### G.     PMC's Injunction Count is Not Subject to Dismissal

Lastly, McKesson moves to dismiss Count II of the Second Amended Complaint, in which PMC requests temporary or permanent injunctive relief. However, only claims for relief are subject to dismissal under Rule 12(b)(6). Since an injunction is not a claim

for relief but rather relief itself, dismissal is not the appropriate vehicle for disposing of Count II.  *See Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002).

**IV.    CONCLUSION**

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint or, in the Alternative, for a More Definite Statement (Doc. 51) is **GRANTED IN PART** and **DENIED IN PART**.  Counts VI and XI are **DISMISSED**.  Defendant has **fourteen (14) days** from the date of this Order to answer the remainder of Plaintiff's Second Amended Complaint.

**DONE AND ORDERED** in Orlando, Florida on March 10, 2017.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

14